**EXHIBIT 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HENRY FORD HEALTH SYSTEM,

               Plaintiff,

                                    Case No. 08-11270

vs.

                                    HON. BERNARD A. FRIEDMAN

ASSURANT HEALTH, a foreign corporation,
TIME INSURANCE COMPANY, a
California Corporation, UNION SECURITY
INSURANCE COMPANY, a California
Corporation, and JOHN ALDEN LIFE
INSURANCE COMPANY, a California
Corporation,

               Defendants,

_____/

| | |
|---|---|
| Paul J. Millenbach  (P43795)<br>FOSTER, SWIFT, COLLINS<br>  & SMITH, P.C.<br>Attorneys for Plaintiff<br>32300 Northwestern Hwy., Ste. 230<br>Farmington Hills, MI  48334<br>(248)  539-9900 | Lauren J. McGill (P43796)<br>FISCHER, FRANKLIN & FORD<br>Co-Counsel for Defendants<br>Guardian Building, Suite 3500<br>500 Griswold Street<br>Detroit, MI  48226-3808<br>(313) 962-5210<br><br>William Beatty<br>JOHNSON & BELL, LTD.<br>Co-Counsel for Defendants<br>33 West Monroe Street, Ste. 2700<br>Chicago, IL  60603-5404<br>(312)  372-0070 |

_____/

## **DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES**

     NOW COMES Defendants ASSURANT HEALTH, TIME INSURANCE

COMPANY, UNION SECURITY INSURANCE COMPANY AND JOHN ALDEN

LIFE INSURANCE COMPANY (hereinafter collectively referred to as Defendant

"Time")[1], by their attorneys, JOHNSON & BELL, LTD. and FISCHER FRANKLIN &

FORD, and answers Plaintiff's complaint as follows:

1.　　Time admits the allegations, upon information and belief.

2.　　Time denies the allegations for the reason they are untrue.  In further response,
"Assurant Health" is not a legal entity, but instead is a trade name utilized by the
Defendants in the marketing of certain insurance products and is incapable of
being sued.

3.　　Time admits only that it is a corporation with its principal place of business in
Wisconsin, that it is licensed to do business in the State of Michigan and that it is
not a resident of the State of Michigan.  All other allegations are denied.

4.　　Time neither admits nor denies the allegations as Union Security Insurance
Company is not a proper party and will be dismissed from this action.

5.　　Time neither admits nor denies the allegations as John Alden Life Insurance
Company is not a proper party and will be dismissed from this action.

6.　　Time neither admits nor denies the allegations as it is without knowledge or
information sufficient to form a belief as to the truth of the allegations.

7.　　Time admits that venue is proper and that this Court has personal jurisdiction over
it.  All other allegations are denied.

## COMMON ALLEGATIONS

8.　　Time incorporates by reference its answers to paragraphs 1 through 7 as if
restated in their entirety.

9.　　Time neither admits nor denies the allegations as it is without knowledge or

---

[1] The first-named defendant in Plaintiff's Complaint:  "Assurant Health" is not a legal entity and is incapable of being sued.  Defendants Union Security Insurance Company and John Alden Life Insurance Company are not proper parties as the subject insurance certificate was underwritten by Time.  Plaintiff will file a voluntary dismissal of these three defendants and the action will proceed against Time.

11.    Plaintiff's claims are barred due to failure of a condition precedent to effectuate coverage under the subject certificate of insurance.

12.    Plaintiff's claims are barred due to failure of a condition subsequent.

13.    Plaintiff's claims may be barred because the insurance contract is void due to Stack's fraud and misrepresentation during the application process.

14.    Time reserves the right to assert additional affirmative defenses as may be disclosed during the course of additional investigation and discovery.

WHEREFORE, Defendants ASSURANT HEALTH, TIME INSURANCE COMPANY, UNION SECURITY INSURANCE COMPANY AND JOHN ALDEN LIFE INSURANCE COMPANY, prays that this Court enter a judgment of no cause of action and/or dismiss Plaintiff's complaint in its entirety, and award such other and further relief as the Court deems just and proper.

May 5, 2008

Respectfully submitted,

s/Lauren J. McGill
One of the attorneys for Defendants
Fischer, Franklin & Ford
500 Griswold Street, Suite 3500
Detroit, MI 48226-3808
(313) 962-5210
mcgill@fischerfranklin.com
P43796

and

William Beatty
JOHNSON & BELL, LTD.
33 West Monroe St., Ste. 2700
Chicago, IL  60303-5404
(312) 372-0070

## CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2008, I electronically filed the foregoing with the

Clerk of the Court using the ECF system, which provided notice to the following:

Paul J. Millenbach
FOSTER, SWIFT, COLLINS & SMITH, P.C.
32300 Northwestern Highway, Suite 230
Farmington Hills, MI 48334


s/Lauren J. McGill
FISCHER, FRANKLING & FORD
500 Griswold Street, Ste. 3500
Detroit, MI 48226-3808
(313) 962-5210
mcgill@fischerfranklin.com
P43796

and

William Beatty
JOHNSON & BELL, LTD.
33 West Monroe St., Ste. 2700
Chicago, IL 60303-5404
(312) 372-0070



1005 Main Street
P.O. Box 1599
Boise, ID 83701-1599

Phone: 800-328-4316

March 12, 2007

Melinda Hinman
Hinman Orchards
3643 Scott Rd
Hood River   OR   97031

Re: Employer Group No. 539153 - 0002 - 009

Dear Ms. Hinman:

Our records indicate that Talia will be 20 years old on May 15, 2007.   In order to remain eligible for coverage he/she must be either enrolled as a full-time student in an accredited school or college and not employed full-time or claimed as a dependent on your current Internal Revenue Service (IRS) tax return and not be employed full-time.

Also, a dependent incapable of self-sustaining employment due to mental or physical handicap that is dependent on you for support, may be eligible to continue dependent coverage under your plan.

Any dependent who is in the armed forces, resides outside the U.S. or Canada, is employed on a full-time basis, or is married, is not eligible as a dependent under the plan, unless otherwise required by state law.

If there is a change in your dependent's status at any time, you are required to notify us. Failure to notify us with a change in status could result in retroactive cancellation of your dependent's coverage and non-payment of claims.

We reserve the right to request documentation to verify dependent eligibility, which may be requested at any time, including at the time claims are submitted to us for consideration.

Sincerely,

Premium Services Department

231
dep19ps2
A2MEM 0 0

AR3117

Assurant Health is the brand name for products underwritten and issued by John Alden Life Insurance Company.        Form 29065-BO-JA (Rev. 4/2007)

**EXHIBIT 2**

***** FILE COPY *****



John Alden Life Insurance Company
501 West Michigan Avenue, Milwaukee, WI 53203
A Stock Company

# CERTIFICATE OF GROUP INSURANCE

We certify that You are Insured through Your Employer under the terms of the following Group Policy:

Group Policy Number:    G-67
Group Policy Holder:    JOHN ALDEN AGRICULTURAL INDUSTRIES GROUP
TRUST

Please see the Eligibility section for details on when Your insurance begins.

This Certificate outlines important features and rights of Your coverage and Our obligations. In case of conflict, the actual terms of the Group Policy on file with Our Company will control.

This Certificate replaces any prior ones that have been issued to You under any of Our Group Policies, as of this Certificate's effective date.

Secretary

President

J-4000-OR (MED)

**AR9**

***** FILE COPY *****

## BENEFIT SUMMARY

| | |
|---|---|
| Effective Date of<br>This Benefit Summary: | This replaces any other Benefit Summary Previously Issued.<br>APR 1,2005 |
| Insured Employee: | MELINDA HINMAN |
| Employee's Effective Date: | APR 1,2004 |
| Certificate Number: | 539153-0002-009 |
| Dependent Coverage: | CHILDREN ONLY<br>TALIA M HINMAN |

| | |
|---|---|
| Employer: | HINMAN ORCHARDS |
| Employer Group Number: | 539153 |
| Employer Effective Date: | MAR 1,1990 |
| Category of Employees<br>Eligible: | Full-Time Employees |

### SCHEDULE OF MEDICAL BENEFITS

| | |
|---|---|
| Deductible | |
|     Individual | $1,000 |
|     Family Limit | $3,000 |
| Out-of-Pocket Limits - (Does not include the<br>Deductible) | |
|     Individual | $1,000 |
|     Family Limit | $2,000 |
| Benefit Percentage | 80% |
| Maximum Lifetime Benefits Per Insured<br>Person While Insured Under this Plan.  Also<br>Includes Specific Benefit Lifetime Maximums. | $5,000,000 |

Penalties for:

| | |
|---|---|
|     Not Meeting UR Requirements | 15% reduction in Covered Medical Charges*, up to<br>$1,000 per year |
|     Non-Emergency Use of the ER | 30% reduction in Covered Medical Charges* |

*before application of the Deductible and Benefit Percentage; the amount of the reduction will not be used to satisfy the Deductible or Out-of-Pocket limit.

CERTAIN CHARGES ARE LIMITED AS BRIEFLY DESCRIBED BELOW.  ALL COVERED MEDICAL CHARGES ARE FULLY EXPLAINED IN THE <u>COVERED MEDICAL CHARGES, CHARGES NOT COVERED</u>

J-4000-OR (MED)                                5

**AR13**

\*\*\*\*\* FILE COPY \*\*\*\*\*

improvements made to the home or place of business, waterbeds, whirlpool baths, exercise and massage equipment and adjustments made to vehicles. It also does not include equipment which can be used by multiple individuals.

### Emergency

An medical condition that manifests itself by symptoms of sufficient severity that a prudent person possessing an average knowledge of health and medicine would reasonably expect that failure to receive immediate medical attention would place the health of the Insured Person, or a fetus in the case of a pregnant woman, in serious jeopardy.

Some examples of an Emergency are: apparent heart attack including, but not limited to, severe, crushing chest pain radiating to the arms and jaw; cerebral vascular accidents; severe shortness of breath of difficulty in breathing; severe bleeding; sudden loss of consciousness; convulsions; severe or multiple injuries, including obvious fractures; severe allergic reactions; cyanosis; apparent poisoning.

### Emergency Medical Screening Exam

The medical history, examination, ancillary tests and medical determinations required to ascertain the nature and extent of an Emergency medical condition.

### Emergency Services

Those health care items and services furnished in an emergency department and all ancillary services routinely available in an emergency department to the extent they are required for the stabilization of the patient.

### Employer

The employer named on the first page of the Benefit Summary.

### Enrollment Date

The date You or Your Dependent(s) enroll for coverage under this plan or, if earlier, the first day of the Waiting Period for such enrollment. For Late Enrollees, Enrollment Date means the first date of coverage under this plan.

### Exclusion Period

The period of time during which specific treatment or services are excluded from coverage.

### Experimental or Investigational

A service or supply is Experimental or Investigational when We determine that it is:
1. not of proven benefit for the particular diagnosis or treatment of a particular condition, as established by any of the reference compendia cited below; or
2. not generally recognized by the medical community as effective or appropriate for the particular diagnosis or treatment of a particular condition; or
3. provided or performed in special settings for research purposes or under a controlled environment or clinical protocol.

We will apply the following five criteria in determining whether services or supplies are Experimental or Investigational:
1. Any medical device, drug, or biological product must have received final approval to be marketed by the FDA for the particular diagnosis or condition. Any other approval granted as an interim step in the FDA regulatory process, e.g., an Investigational Device Exemption or an Investigational New Drug Exemption, is not sufficient. Once FDA approval has been granted for a particular diagnosis or condition, use of the medical device, drug or biological product for another diagnosis or condition will require that one or more of the following established reference compendia recognize the usage as appropriate medical treatment:

    a. The American Medical Association Drug Evaluations;
    b. The American Hospital Formulary Service Drug Information; or
    c. The United States Pharmacopeia Drug Information.

AR24

***** FILE COPY *****

As an alternative to such recognition in one or more of the compendia, the usage of the drug will be recognized as appropriate if it is recommended by a clinical study and recommended by a review article in a major peer-reviewed professional journal. A medical device, drug or biological product that meets the above tests will not be considered Experimental or Investigational.

In any event, any drug which the FDA has determined to be contraindicated for the specific treatment for which the drug has been prescribed will be considered Experimental or Investigational;

2.  Conclusive evidence from the published peer-reviewed medical literature must exist that the technology has a definite positive effect on health outcomes; such evidence must include well-designed investigations that have been reproduced by non-affiliated authoritative sources, with measurable results, backed up by the positive endorsements of national medical bodies or panels regarding scientific efficacy and rationale;

3.  Demonstrated evidence as reflected in the published peer-reviewed medical literature must exist that, over time, the technology leads to improvement in health outcomes, i.e., the beneficial effects outweigh any harmful effects;

4.  Proof as reflected in the published peer-reviewed medical literature must exist that the technology is at least as effective in improving health outcomes as established technology, or is usable in appropriate clinical contexts in which established technology is not employable; and

5.  Proof as reflected in the published peer-reviewed medical literature must exist that improvements in health outcomes, as defined in item 3 above, is possible in standard conditions of medical practice, outside clinical investigatory settings.

### Extended Care Facility

An institution that meets all of the following requirements:
1.  it must be operated pursuant to law;
2.  it must be approved for payment of Medicare benefits or be qualified to receive such approval if requested;
3.  it must be primarily engaged in providing, in addition to room and board accommodations, skilled nursing care under a licensed Physician's supervision;
4.  Registered or Licensed Practical Nurses must supervise 24 hours a day; and
5.  a daily record for each patient must be maintained.

This includes intermediate care facilities, skilled nursing care facilities, nursing homes and convalescent homes.

Extended Care Facility does not include any institution that is primarily a clinic; a rest home; a home for the aged; a place for treatment of alcoholism or drug addiction and chemical dependency; a place for Custodial Care; or a facility for Mental Illness.

### Functional Nervous Disorder

Any mental or nervous disorder (including neuroses, psychoneuroses, psychopathy, psychosis or other emotional disorders); affective disorders (including bipolar disorder and major depression); Tourette's disorder; panic disorder; attention deficit disorder; developmental delay or other learning disorders; conduct disorder; alcoholism; drug addiction and chemical dependency.

### Grievance

A written complaint submitted by or on behalf of an Insured Person regarding the:
1.  availability, delivery or quality of health care services, including a complaint regarding an adverse determination made pursuant to Utilization Review;
2.  claims payment, handling or reimbursement for health care services; or
3.  matters pertaining to the contractual relationship between You and Us.

### Group Health Plan

An employee welfare benefit plan (as defined in section 3(1) of the Employee Retirement Income Security Act (ERISA) to the extent the plan provides medical care to Employees or their Dependents directly through insurance, reimbursement, or otherwise.

AR25

\*\*\*\*\* FILE COPY \*\*\*\*\*

Filing a Claim Against a Third Party and Other Actions.

In the event that an Insured Person files a claim, lawsuit or otherwise seeks to recover damages from a third party arising from the negligent act or omission of such third party, the Insured Person will include in such lawsuit a claim for the medical benefits or payments provided to or on behalf of the Insured Person by Us. An Insured Person will take such action, furnish such information and assistance and execute and deliver all instruments that We may require to enforce Our reimbursement and subrogation rights under this Certificate.

Attorneys' Fees and Other Costs.

In the event that We engage an attorney or other agent for the purpose of enforcing Our subrogation or reimbursement rights as stated in this provision against an Insured Person's failure to cooperate with Us, the prevailing party in any legal action or other proceeding brought to enforce such rights will be entitled to an award of its costs, including, without limitation, reasonable attorneys' fees associated with all trial and appellate proceedings.

Notice, Right of Intervention.

The Insured Person will provide Us with timely written notification in the event the Insured Person or the Insured Person's Dependent suffers Injury or Illness by virtue of the negligent act or omission of a third party. Such a notice must inform Us (i) of the nature of the Injury or Illness; (ii) the names, addresses and phone numbers of any insurance companies or other third parties who may be responsible for payment of damages suffered by the Insured Person or Dependent; (iii) a description of the accident or occurrence that the Insured Person reasonably believes was responsible for the Injury or Illness at issue and the approximate date(s) upon which such accident or occurrence occurred; and (iv) the name of any legal counsel retained by an Insured Person in connection with any such accident or occurrence. In the event that an Insured Person brings a lawsuit, counterclaim, cross-claim or any other action in connection with any such accident or occurrence, We will be provided with copies of all pleadings, notices and other documents and papers that relate to Our rights of reimbursement or subrogation under this Agreement. We reserve the right to intervene in any proceeding in which an Insured Person is a party to the extent that such intervention is reasonably necessary to protect Our rights of reimbursement or subrogation under this Agreement.

Interpretation of Certificate and Policy

We have discretion to construe and interpret the terms and provisions of the Policy and Certificate to make determinations regarding issues which relate to eligibility for benefits, to decide disputes which may arise relative to an Insured's rights and to decide questions of Plan interpretation and those of fact relating to the Policy and Certificate and the payment of claims.

Certificates are issued in accordance with existing state and federal law. In the event new state or federal laws are enacted which conflict with current provisions of the Certificate, the provisions of the Certificate impacted will be administered in accordance with the new laws despite anything in the Certificate to the contrary.

ERISA Claim Appeal Procedure

In compliance with the provisions of the Employee Retirement Income Security Act of 1974 (ERISA), John Alden Life Insurance Company will provide a written explanation of the reason it denies, in whole or in part, a claim for benefits under the plan described in this Certificate. If there is any question about the settlement or denial of a claim You (or Your Beneficiary in case of death) have the right to request a full and fair review of that claim.

The review process is as follows:

*    Within 60 days of receiving a claim denial, a certified letter must be sent to Us stating the reasons for appeal and any additional information to support the claim.

*    To help Us identify and process the appeal, include either a photocopy of Our letter of denial or clearly identify in Your letter the Employee's Certificate number, the person for whom claim was made, the provider and amount of the claim, the date claim was made, and the date it was denied.

*    After We review the written information, You or Your Beneficiary or representative may appear personally to give further written or verbal support to the claim and review any pertinent documents.

J-4000-OR (MED)                                56

**AR64**

**EXHIBIT 3**

2-27-06

Level One Appeal For Talia Hinman : 539153-9-D00

For denial of services for references #052563800
#052563807
and    #052563810
and any associated services

Dale and Melinda Hinman
Group # 539153
3643 Scott Rd.
Hood River, Oregon 97031
(541) 354-2365

AR1688

## Table of Contents

A. Diagnostic Guidelines ................................................................ 2
B. Definition of "confirmed" .......................................................... 3
2. Three Requirements of Diagnosis............................................... 4
    A. Clinical manifestations........................................................ 4
        i. Patient's documented clinical symptoms............................ 4
        ii. Patient's documented clinical history............................... 4
        iii. Patient's documented personal history ............................ 5
    B. Epidemiolic information; exposure ......................................... 5
    C. Laboratory evaluation ......................................................... 6
        i. The etiological nature of B. burdorferi .............................. 6
        ii. The ELISA.............................................................. 6
        iii. Western blot............................................................. 7
        iv. Laboratory evaluation of this patient............................. 8
3. Treatment is NOT evidence of a E/I practice ................................ 8
4. Specific Commentary; standard of care ...................................... 9
5. Conclusion ........................................................................ 11
6. References......................................................................... 13

Supporting Documents:

Section A -  Dr. Green's Case Evaluation, January 17, 2006

Section B – Oregon Tick Vector
        Isolation of *Borrelia Burgdorferi* from *Neotoma Fuscipes, Peromyscus Maniculatus, Peromycus Boylii,* and *Ixodes Pacificus* in Oregon

Section C – Relapse / Persistence of Lyme Disease Despite Antibiotic Therapy

Section D – Seronegativity in Lyme borreliosis and Other Spirochetal Infections

AR1692

This is a level 1 appeal argument for denial of services for the following references and all services, service dates, and provider/facilities included:
#052563800,  #052563807, and  #052563810

We contend that Talia Hinman has been properly diagnosed as to have Lyme disease with Arthritis, Encephalopathy and Neuropathy and that  Assurant Health is incorrect in it's denial of claims. The reasons for this are as follows:

A. Diagnostic Guidelines

Assurant Health has applied improperly developed diagnostic criteria to this case. Clinical diagnosis in the United States does not require the criteria as cited by Assurant Health, rather, this Insurer has used diagnostic criteria created and endorsed by the CDC solely for the purpose of national surveillance. Use of this criteria for clinical diagnosis is denounced by the both CDC and federal law.

A specific example of this is the third criteria requirement, which states need for "either an EM rash, or both positive ELISA and Western Blot. This is a literal stating of a "presumptive" case definition as devised by the CDC; not however, for purposes of clinical diagnosis. The CDC cites this disclaimer alongside both confirmed and presumptive case definitions: "A restrictive case definition is intended to enhance the specificity of surveillance. Reduced sensitivity and, therefore, exclusion of atypical presentations may result".  The CDC further states: "This surveillance case definition was developed for national reporting of Lyme disease; "it is not appropriate for clinical diagnosis.".  These statements are emphatically upheld by Public Law 107-116, Departments of Labor Health and Human Services, and Education, and Related Agencies Appropriations Act 2002, signed by President Bush 1-10-2002. As quoted from wording included in the bill:

"The committee recognizes that the current state of laboratory testing for Lyme disease is very poor. The situation has led many people to be misdiagnosed and delayed proper treatment. The vaccine clinical trial has documented that more than one third (36%) of the people with Lyme disease did not test positive on the most sophisticated tests available. The ramifications of this deficit in terms of unnecessary pain, suffering, and cost is staggering."... "The committee is distressed in hearing of the widespread misuse of the current Lyme disease surveillance case definition. While the CDC does states that "this surveillance case definition was developed for national reporting of Lyme disease: it is NOT appropriate for clinical diagnosis", the definition is reportedly misused as a standard of care for healthcare reimbursement, product (test) development, medical licensing hearings, and other legal cases. The CDC is encouraged to aggressively pursue and correct the misuse of this definition."

This legal position is further supported by evidence based research. "Recent studies (6) by the group responsible for Lyme proficiency testing for the College of American Pathologists (CAP), came to the conclusion that the currently available

ELISA assays for Lyme disease do <u>NOT</u> have adequate sensitivity to meet the two tiered approach recommended by the CDC/ASPHLD group (2). The requirement of positive results for both the ELISA and Western blot, is not only inappropriate use of criteria, but scientifically invalid as well.

Another example of Assurant Health's misapplication of diagnostic criteria exists within the second criteria requirement for diagnosis. Literal adherence to the wording of this guideline would mean exclusion, for diagnosis and consequent treatment, of any persons not living within or traveling through an endemic area. This would be a grave disappointment to the 56 Oregonians who were confirmed CDC positive between 2000 and 2003, or the 18 who were reported for 2005 (1). The CDC does in fact state that Lyme disease occurs in all fifty of the United States. Again, surveillance criteria are devised with lessened consideration of risk associated with issues of exclusion and probability. The same cannot be applied to clinical diagnosis. Criteria which may be correct but incorrectly applied (ie; criteria applicable to surveillance purposes, but not to clinical diagnosis), does not constitute a standard of care.

## B. Definition of "confirmed"

Insurer states that "patient did not meet one or more of (3) diagnostic criteria, And, that "the treatment of Lyme disease in the absence of a confirmed diagnosis is investigational." Patient contends, first, (and argued above), that the diagnostic criteria as cited by Assurant Health is inapplicable. Further, patient has not found anything in her certificate which defines either "confirmed" nor the word "confirmed " as it relates to Investigational. Reference to the word "confirmed" by the CDC, is again, based on a standard which was devised for research purposes and national surveillance and **not** clinical diagnosis. A patient's Lyme infection might be "confirmed," by virtue of a positive PCR tissue sample, but the "characteristic sparsity of organisms (62)" makes this such a rare test result, that no medical body of knowledge would or has considered excluding a patient without it. There are some "recommendations," but again, these do not define confirmation of disease, only the validity of positive and negative test results. For example, a position paper by Peter Tugwell cites "recommended" parameters for serology testing, but his admitted basis are medical/scientific abstracts which exclusively examines cost effectiveness issues in regard to probabilities (44). The Division of Microbiology and Infectious Disease state that "diagnosis must be based on characteristic clinical findings in which the results of laboratory tests play a supportive role". The IDSA has published guideline criteria for treatment, but not for diagnosis; it does not address the issue of diagnosis of third or late stage Lyme at all; though Oregon State Health Services, Sept. 2005, divides Lyme disease into these three distinct categories. The ILADS (International Lyme And Associated Disease Society) is a defensible body as a standard of care and does offer diagnostic guidelines, which are as follows: "Lyme disease is a clinical diagnosis based on patient history, including symptoms and exposure to the tick vector and physical findings". Most practitioners interpret this to mean a clinical definition of Lyme disease that includes a combination of symptoms and clinical signs with serological support."(11).

2. Three Requirements of Diagnosis (as stated by Assurant Health)

Patient believes diagnosis has been based on clinical manifestations, epidemiologic information and laboratory information (see "A" Dr. Green). For further argument:

A. Clinical manifestations

i. Patient's documented clinical symptoms

Talia Hinman's symptoms are well documented (see "A" Dr. Green). Contrary to "non-specific complaints", Talia's health has been seriously and specifically compromised. Her symptoms included: Substantial fatigue, fever, abnormal or swollen lymphs, sweats and chills, weight loss, persisting and constant headache, severe light sensitivity, severe joint pain in hips, knees and neck, intermittent migraines, vomiting, abdominal pain, alternating diarrhea and constipation, sleep disturbance, severe back pain, vertigo, poor memory and ability to read or focus, mood swings. **While any of these symptoms might individually suggest other conditions, the combination of neurological, arthritic, and gastrointestinal symptoms is highly suggestive, if not definitive of late stage Lyme disease.** Talia's symptoms were of a severity, that, despite an array of prescriptive medications; for, migraine, stomach pain, acid reflux, joint inflammation and/or and bowel inconsistency, ten months of rest, and a regimen of vitamins, she was still unable to function at a basic level; unable to sit or rest in any position without considerable unabated pain, unable to drive, read or focus or attend school. Talia's appointment was discussed and supported by Dr. Anthony Gay (primary care, see medical record) who stipulated that he would like to review Dr. Green's recommendations. He did so and found them satisfactory.

ii. Patient's documented clinical history

Clinical history is documented. (see medical records) Between January and October of 2004, Talia was seen by primary care physician ten times, and referred to eight different specialists. Specialists included: a PNP Pediatric Gastroenterology, Two separate Gastroenterologists, an ENT specialist, a Neurologist, a Psychologist, an Infectious Disease specialist, and an Endocrinologist. Dr. Green, therefore. had benefit of patient's fairly exhaustive medical history. This gave Dr. Green opportunity to consider or dispel alternative etiological causes, for example, thyroid dysfunction, brain abnormalities (tumor), chemical and hormonal imbalances, etc.. by means of: MRI's, CT scans, x-ray, Monospot, CBC, chemistry panel, amylase, metabolic tests, endoscope with biopsies, etc...Also included in this compiled medical record, are anecdotal descriptions of Talia's symptoms as documented by each specialist as well as each visit with primary care.

Assuring Health has challenged Dr. Green's testing for heavy metal toxicity, however this is an appropriate consideration for differential diagnosis. Assurant Health has not challenged the x-ray for mediastinal adrenopathy nor testing for toxoplasmosis, though both were of doubious possibility. Talia does live in the midst of a working fruit orchard

Page 4

AR1695

which is annually sprayed with a copper/oil solution. Perhaps because she could not possibly determine the potential ingredients of other sprays as well, Dr. Green felt this was a prudent test. Our drinking water is glacial from Crystal Springs co-operative and our irrigation is from our own artesian spring.

### iii. Patient's documented personal history

<u>Personal history is documented.</u> Prior to illness in 2004, Talia was an extremely vital and vibrant personality. She had required minimal medical attention throughout childhood and adolescence. Progressive joint pain is documented beginning in 2003, which was not relieved by regular chiropractic appointments, physical therapy, orthopedic aides, or an appointment with an Osteopathic Surgeon. Talia was well recognized in her community as an outstanding athlete in basketball, softball and snowboarding. (4A school varsity starter, District MVP and team MVP softball fast-pitch) Well known for character, stamina, humor. Tag student (Talented and Gifted). Dr. Green is able to form a baseline of personality and health before onset of illness, and develop a sense of chronology.

### B. Epidemiolic information; exposure

Patient lives in Hood River, Oregon. In late 2002, she had intensive care of an injured owl, which was found to be laden with tiny ticks. Oregon State Health Services (Sept 2005) cites that the "Ixodid tick bite is generally painless and many LD patients have no recollection of a tick bite, so the absence of a tick bite history is not inconsistent with a diagnosis of LD"(1). Another source cites that fewer than 50% of all Lyme disease patients recall a tick-bite (45). In it's nymph stage, when likely to bite, this tick is larger than the size of a poppy seed, and is almost translucent. Talia has no recollection of either EM rash or tick bite, though an EM rash could have conceivably gone unrecognized. Talia is very active outdoors; camping, fly-fishing, etc... We live rurally, on wooded acreage, and are regularly visited by an assortment of wildlife, such as skunk, raccoon, deer, game birds, etc...Talia also has an assortment of pets. Her father and brother are hunters, and dress and process game (deer and elk) in our garage. She has played on a traveling ASA softball team, since she was 12, and in 2002-2003 traveled from the Canadian border/northern Washington to Southern California, including Florida. As softball players, these girls are constantly on the ground, open fields, etc... She has been camping in Josephine County, OR. Oregon had 56 confirmed cases of Lyme between 2000 and 2003. The majority of these were in Josephine County (see "B"). Hood River County had one "confirmed" case in 2005. Hood River has a notably passive reporting policy; The County Health Department does not require (nor is aware) of "presumptive" case distinctions, and there is no medical community awareness as to offering serology testing to confirm EM rashes. A study of tick "capture" in Oregon has shown infection with Lyme from four different vector hosts (see "B" Ore. Tick)

Page 5

## C. Laboratory evaluation

Dr. Green's medical judgment concerning laboratory results is best described in her own document. (see "A" Dr. Green). Also:

### i. The etiological nature of B. burdorferi

We DO find it factually significant, that the complexities of the Lyme organism have as yet evaded research's best efforts to find a definitive test to either unequivocally confirm active infection, or to prove it's eradication. This is due to a number of variables. Lyme spirochetes can penetrate human fibroblasts and live intracellularly (58); intracellular pathogens are notoriously difficult to treat and cure(24,25,26,27). Lyme is related to the same structural agents as syphilis and relapsing fever (1); both of which are notable for their persistent nature despite treatment. Lyme can infect immunologically privileged sites which makes antibiotic penetration difficult (30). Also, Lyme displays an altered morphology, referred to as L-forms, cell wall deficient L-forms, and cyst form. This pathogen's ability to change from L-form to cyst and back to a helical form may be instrumental in it's ability to evade the host's normal defense mechanisms (28,29,58). An irony exists, because serology tests identify markers; our antibody response. This means that the same complex biological properties inherent of this pathogen, as just described, are the very mechanisms which allow it to evade the human host's defensive response; antibody production. Therefore, "seronegative patients may be the least able to mount an effective defense against the infection and may be the worst infected"(59). Additional examples of this phenomenon exist; for example:

- Rawlings JA.,found that of 14 culture positive patients, only 3 had positive antibody titers (8).
- Auguero-Rosenfield et al., showed that (only) 70% of documented LD patients had significant antibody response (4,5).
- Donta ST., found that approximately 20% of Lyme disease patients were seronegative (22). And,
- Engstrom et al., confirm (3) that almost one third of all Lyme patients are IgG seronegative during the first year.

### ii. The ELISA

- "Recent studies (6) by the group responsible for Lyme proficiency testing for the College of American Pathologists (CAP) came to the conclusion that the currently available ELISA assays for Lyme disease do NOT have adequate sensitivity to meet the two-tiered approach recommended by the CDC/ASPHID group (2).
- Bakken et al (6) stated that a screening test must have a sensitivity >95% to adequately screen for Lyme disease and that the currently available ELISA tests do not meet this criteria.
- **Aguero-Rosenfeld et al: Two years after physician diagnosed EM rash, 45% of patients were negative by ELISA (4,5)**

AR1697

-If patients are treated early with antibiotics, their antibody response may be
reduced or curtailed (7).

ELISA has not been found to have adequate sensitivity, by College of
American Pathologists. It can also be reduced or curtailed by early antibiotic
treatment. Medical history shows Talia was prescribed Augmentin 875mg for 21
days in April'04, before her ELISA, which was negative.

iii. Western blot

CDC criteria for positive Western Blot is 5 of 10 antibody bands for IgG
positivity. The study this criteria was based on, used EM rash patients within a short
period of their disease onset. They drew blood every two weeks during a four month
period and any positive event (5 of 10 bands) was counted as a positive patient, even if
they were negative at a different time in the study. The study excludes two of the most
important and specific antigens, 31 kDa (OspA) and 34 kDa(OspB), which appear later
in response. These same antigens were also excluded from the IgM. A number of
studies demonstrate the effect of applying this surveillance based criteria to actual case
diagnosis:

-Hilton et al (10) showed that in his study group of 50 patients with confirmed
   Lyme, 4 patients would have been missed by excluding 31 kDa(OspA) and 34
   kDa(OspB).
-CLIA certified Igenex Laboratory (33)would have missed 2 of 18 proficiency
   samples by excluding antibodies to these two antigens.
-Engstrom et al (3) found that 2 of 5 bands gave them a specificity of 93 to 96%
   and a sensitivity of 100% in the (only) 70% of patients who made antibody.
-Aguero-Rosenfeld et al (5)L found that **although a majority (89%) of patients
   with EM rash developed IgG antibodies detected by Western Blot
   sometime during disease, only 22% were positive by the criteria of the
   CDC/ASPHLD.**

Again, such examples of errors in missed diagnosis, are of limited critical
importance when assessing the endemic nature of a geographic region. However, when
the same criteria is applied to actual clinical diagnosis, these same errors are critical
and unacceptable. Additional studies concerning the Western blot are cited:

- The CDC has suggested that the IgM should only be used during the first month
   after a tick bite, **but**, studies by Steere (9), Jain et al (11) and Igenex Lab(33)
   all found the IgM to be important in recurrent and persistent disease.
-Sivak et al (12) found that IgM Western blot had a 96% specificity if patients had
   at least a 50% chance of having Lyme disease.
-Osk et al (13) using culture and PCR to confirm Lyme disease, reported that
   specific IgM to B. burdorferi is sometimes the only antibody detected in
   persistent disease. They felt this data supported the idea that some Lyme
   patients have restricted IgM-only response to Lyme.

AR1698

-Antibody tests are not static. A patient negative in the Western blot may
seroconvert to a positive pattern with treatment.

-The CDC, US Food and Drug Administration (FDA), and NIAID have all
expressed concern regarding the over-reliance on laboratory tests for
diagnosing Lyme disease (21,23,60), with the FDA stating that tests
"should never be the primary basis for making diagnostic or treatment
decisions". "Diagnosis should be based on patient history, including
symptoms and exposure to the tick vector and physical findings" (21)

### iv. Laboratory evaluation of this patient

Talia's Western blot is positive for IgG and IgM. She evidenced both 31kdA Osp
A band and 39 kda band. The 39 kda band is considered particularly Lyme specific. See
("A") for evaluation of specific antigen bands. Talia was also found positive for WA-1
babesia antibody (at 1:640 by Sonoma County Health Department).

### 3. Treatment is NOT evidence of a E/I practice

Dr. Green's medical services are not an E/I practice. Dr. Green is a reputable,
practicing physician with the benefit of seeing a number of infectious etiologies in an
endemic area. Dr. Stricker, of this same office, is also a practicing clinical physician of
hematolic specialty. He is president of the International Lyme and Associated Disease
Society (ILADS), and has been successfully treating this complex organism for many
years. To reiterate, this office is not a research facility, nor does it represent any form of
research or research related protocol. Both Dr. Green and Dr. Stricker practice in
accordance of the standard of care as defined by the ILADS guidelines.

Publication of ILADS guidelines are offered by the Agency for Health Care
Research and Quality (AHRQ), U.S Department of Health and Human Services.
ILADS is an interdisciplinary group of physicians and researchers dedicated to
improving the diagnosis and treatment of tick borne diseases. Members include
neurologists, rheumatologists, internists, family practitioners, pediatricians,
immunologists, hematologists, ophthalmologists and psychiatrists. They use an empiric
approach based on clinical evidence of active infection to determine treatment duration.
Evidence of ongoing infection is determined by examining all clinical data, including
persistence of symptoms, serologic testing, and other forms of collaborating tests, such
as MRI scans, SPECT imaging, neurocognitive testing, or other neurological
indications. Ultimately the determination of efficacy of treatment depends on the
clinical response. The guidelines of the ILADS are evidence based and peer reviewed,
and substantially endorsed by practicing physicians in the medical community. In one
study, Ziska, Donta, and Demarest (46)examined physician preference regarding
diagnosis and treatment of Lyme disease in the U.S., and found that 57% of responding
physicians treated persistent Lyme disease for three months or more. Another study, at
Columbia University, involving 3400 patients who were screened for persistent Lyme
disease, responded that the mean duration of oral antibiotics was 7.5 months, and the
mean duration of intravenous treatment was 2.3 months (47). In yet another study, 50%
of responding physicians considered using antibiotics for a time greater than one year in

AR1699

a symptomatic seropositive patient. Almost the same number would extend treatment to 18 months if needed (48). The ILADS guidelines, as endorsed by practicing clinical physicians, represent standard of care. Talia recognizes that two distinct standards of care exist concerning diagnosis and treatment of Lyme disease; represented by the IDSA and the ILADS. Both are evidence-based and peer-reviewed. Both viewpoints are practiced by reputable physicians in the community. Both imply some element of risk because evidence does not currently exist to unequivocally prove whether persisting symptoms beyond standardized treatment are the result of autoimmune complexes or persisting infection. Although the Klempner and Krupp studies contradict each other (34,35), the third and most recent NIAID-funded study has been completed and "preliminary results support continued antibiotic treatment for patients with persistent Lyme disease (36). The findings of five non-controlled studies also support continued treatment (37, 38, 39, 40, 41), as does the research findings included in this appeal (see "C"). Talia feels that imposition of a short, standardized treatment theory, could potentially alter her treatment choices in the future and place her unnecessarily at risk for complications that are ultimately less responsive to antibiotics (20). Palliative solutions such as steroids, which are recommended by IDSA for symptoms experienced beyond a 30 day regimen, are "found to increase the progression of active infection, and are contraindicated for active Lyme disease (32). Pain medications involve inherent risks of over-use and side effect. The IDSA has pointed to the dangers of extended antibiotic treatment, but "**The FDA Center for Drug Evaluation and Research reports that a significant amount of data support the safety of long-term antibiotic therapy (61).**

Conversely, a host of peer review and evidence based study suggest profound health risks associated with inadequate, incomplete, or nonexistent treatment. The dangers of developing advanced neurological injury, debilitation and death are well documented (17,18,19,42,). Further serious health consequences are documented in regard to co-infection with Babesiosis, such as joint and heart valve impairment, congestive heart failure, renal failure, and acute respiratory distress syndrome (54,49).

## 4. Specific Commentary; standard of care

To reiterate, Talia Hinmans diagnosis is well founded by her physician, who has used her clinical experience, medical expertise and considerable knowledge of this pathogen, to formulate diagnosis and treatment, based on clinical manifestations, history of symptoms, history and availability of tick exposure, and laboratory evaluation. She has also considered differential diagnosis, and has benefited from Talia's prior extensive medical care. **Dr. Green did NOT initiate oral antibiotics 10/04**, as suggested by Assurant Health. Dr. Green submitted a Western blot, following Talia's initial exam of that date and antibiotic was not initiated until 12/04; after consulting the results of that test.

Dr. Green, again, used sound medical judgment to ascertain that her patient, who had **improved substantially**, still had unresolved neurological and arthritic symptoms. Parenteral antibiotics are generally recommended when there is neurological involvement or complicated Lyme arthritis (16). This is also endorsed by the IDSA (43) though for shorter treatment periods. As already noted, The FDA Center for Drug

Evaluation and Research report that a significant amount of data support the safety of long term antibiotic therapy (61). To additionally minimize any associated risk, Dr. Green prescribed Actigall (300mg), for duration of the IV period. Also, as a safe-guard, Dr. Green ordered lab work to monitor Talia's organ health periodically throughout her therapy. This was administered by Dr. Gay via Dr. Green. Talia keeps a physical appointment with Dr. Green (usually for one to two hours) every twelve weeks. At half intervals (six week), she has a phone consult. Dr.Green may also dialog with primary care and has always been accessible to Talia.

On 11/05, Dr. Green ordered a Western blot with co-infection panel. Purpose was not to re-diagnose, but to use this serology study as tool for evaluating reactive antibody bands. Talia was found positive for co-infection Babesiosis WA-1 (at 1:640, Sonoma County Health Department). Babesiosis is a malaria-type protozoan infection (whereas Lyme is bacterial), and therefore, is responsive to different treatment than Lyme. It is carried by the same Ixidid tick. Babesiosis in of itself, can cause serious health complications. The CDC reports on it's own case study of Babesiosis, "**Even B. microti, which traditionally has been considered less virulent than B divergens in humans, has been associated with critical illness and fatalities**, particularly among elderly, asplenic, or otherwise immunocompromised, patients (50, 51, 52, 53)". It is also notable for it's persistent nature. CDC case record indicates that, despite 30 days of IV antibabesial therapy AND hemodialysis, subpatent parasitemia and persistently high IFA titer (1:1,024) can exist even two months beyond treatment termination (56). A CDC case study of Babesiosis in Kitsap County,WA., is remarkable in that the patient possessed a variety of Babesiosis most molecularly comparable to the European strain which is not usually evidenced in the US and is often fatal. CDC states, "Babesiosis, which can be life threatening, can be caused by novel parasites not detected by serologic or molecular testing…(for) parasites previously recognized to cause zoonotic babesiosis in the United States." It continues that "diagnosis of babesiosis should be considered for febrile persons…**regardless of where they have lived or traveled.** Research suggests that at least 25% of babesiosis cases are also infected with Lyme (25). Had Dr. Green adhered to IDSA protocol, she would likely have prescribed a standardized regimen of brief antibiotic therapy, followed by a prescription of steroids or anti-inflammatories to address remaining symptoms. By assuming an aberrant auto-immune response, Talia's co-infection with Babesiosis might well have gone undiagnosed, with the risk of Talia developing complications of both infections (14,15). We are therefore appreciative of Dr. Green's diligence in evaluating Talia's clinical symptoms in regard to assessing her treatment's efficacy. Further study by Krouse, Speilman, Telford et al, (49) elaborates on the effects of concurrent Lyme and Babesiosis infection; ie:

  - "Co-infection generally results in more intense acute illness and more prolonged convalescence than accompany either infection alone".
  - "Co-infection might also synergize spirochete-induced lesions in human joints, heart and nerves".
  - "Babesial infections may impair human host mechanisms"

AR1701

and, Dr. E. Mylonakis from an *American Family Physician* article of May, 2001 (54) makes further observations:

- -"Factors associated with severe disease include advanced age, previous spleendectomy, or immunodeficient states".
- -"Congestive heart failure, renal failure and acute respiratory distress syndrome are the most common complications."
- -"over 100 different species of babesiosis exist"

## 5. Conclusion

Talia Hinman has been diagnosed with Lyme disease with Arthritis, encephalopathy and Neuropathy. She is currently eighteen years old, and is an incredible person of heart and intellect. But her losses due to this illness have been substantial. Talia has spent almost two years of her young life trying to regain her health from this infection. A previously un-medicated, active, athletic, and happy individual, Talia began experiencing joint pain in 2003 which progressed to an almost unbearable level by fall of 2004. This was accompanied by a plethora of accompanying and severe symptoms, such as migraines, vertigo, fever, abdominal pain, bowel inconsistency, severe light sensitivity, back and neck pain, sleep disturbance, thinking and focusing impairment, etc...to the degree, that she could but minimally function and found pain inescapable. A previous athlete and gifted student; she could barely walk, or read; she could not attend school. Despite the attentions of her primary care and eight specialists within a one year period, Talia saw no perceptible improvement in her health or well-being until she initiated oral antibiotics in 12/04, under the care of Dr. C. Green. Her response has been remarkable. Talia is not yet symptom-free, but has undergone an extraordinary improvement. She has exhibited Jarisch Herscheimerz response (bacterial reaction to antibiotic involving gestation and die off), and, when her symptom resolution plateaued, Dr. Green correctly questioned tissue and CNS penetration (among other variables) and prescribed IV Rosephen. She has also questioned co-infection and adjusted treatment accordingly. Considering the gravity of Talia's initial symptoms; the serious, debilitating and documented consequences of unresolved neurological and arthritic Lyme; and the complication of co-infection; terminating Talia's treatment therapy would be tantamount to medically sanctioned negligence.

Again, Talia's improvement has been one of leaps and bounds. Talia is not yet a healthy person; she works limited hours for an understanding employer and was not able to go to college winter term. She works out, but carefully and minimally, not with the gusto of the athlete she once was. She lives at home, which is hard for an independent young woman. She also, currently, has the new-found struggle of paying for her continuing antibiotic therapy despite a lack of coverage by this insurer, and, rather than tuition, must consider a debt which far exceeds her ability to earn. Despite all this, however, Talia's optimism remains high as she prepares herself to regain her life.

Talia's diagnosis has been made, utilizing extensive knowledge of the Lyme pathogen, clinical experience with treatment, and all of the appropriate protocol of good medical judgment. These same characteristic apply to Talia's treatment therapy, with,

Page 11

AR1702

what approaches, a nearing resolution of symptoms. Both diagnosis and treatment standards have been evidence based, peer reviewed, and endorsed by practicing physicians in the community. As defined, both diagnosis and treatment reflect standard of care, and are not to be considered Experimental or Investigational.

Thank you for your time in considering this matter,

Dale and Melinda Hinman
Policy Holders
2/27/06

# References

1. Oregon Health Services, Investigative Guidelines for Lyme Disease, September 2005.

2. Association of State and Territorial Public Health Laboratory Directors (ASTPHLD). Proceedings on the second national conference on the serological diagnosis of Lyme disease, October 27-29, 1994. Dearborn MI. WashingtonDC. ASTPHLD 1995.

3. Engstrom SM, Shoop E, Johnson RC. Immunoblot interpretation criteria for serodiagnosis of early Lyme disease. *J Clin Microbiol* 1995; 33: 419-427.

4. Aguero-Rosenfeld ME, Nowakowski J, McKenna DF, Carbanero CA, Wormser GP. Serodiagnosis in early Lyme disease. *J Clin Microbiol* 1993; 31: 3090-3095.

5. Aguero-Rosenfeld ME, Nowakowski J, McKenna DF, Carbanero CA, Wormser GP. Evolution of the serologic response to B. burgdorferi in treated patients with culture confirmed erythema migrans. *J Cin Microbiol* 1996; 34: 1-9.

6. Bakken LL, Callister SM, Wand PJ, Schell RF. Interlaboratory comparison of test results for detection of Lyme disease by 516 participants in the Wisconsin State laboratory of hygiene/College of American Pathologists proficiency testing program. *J. Clin Microbiol* 1997; 35: 537-543.

7. Steere AC, Grodzidki RL, Kornblatt AN, et al. The spirochetal etiology of Lyme disease. *N. Engl. J. Med.* 1983; 308: 733-740.

8. Rawlings JA, Fournier PV, Teltow GA. Isolation of Borrelia spirochetes from patients in Texas. *J Cin Microbiol* 1987; 25: 1148-1150.

9. Craft JE, Fischer DK, Shimamoto GT, Steere AC. Antigens of B. burgdorferi recognized during Lyme disease: appearance of new immunoglobulin M response and expansion of the immunoglobulin G response late in illness. *J Clin Invest* 1986; 78: 934-939.

10. Hilton E, Devoti J, Sood S. Recommendation to include OspA and OspB in the new immunoblotting criteria for serodiagnosis of Lyme disease. *J Clin Microbiol* 1996; 34: 1353-1354.

11. Jain VK, Hilton E, Maytal J, Dorante G, Ilowite NT, Sood SK. Immunoglobulin M immunoblot for diagnosis of B. burgdorferi infection of patients with acute facial palsy. *J Cin Microbiol* 1996; 34: 2033-2035.

12. Sivik SL, Aguero-Rosenfeld ME, Nowakowski J, et al. Accuracy of IgM immunoblotting to confirm the clinical diagnosis of early Lyme disease. *Arch Intem Med* 1996; 156; 2105-2109.

13. Oski J, Uksila J, Marjamaki M, Mikoskelainen J, Viljanen MK. Antibodies against whole sonicated B burgdorferi spirochetes, 41 kilodalton flagellin and P39 protein in patients with PCP- or culture-proven late Lyme Borreliosis. *J Clin Microbiol* 1995; 33: 2260-2264.

AR1704

14. Marcus LC, Steere AC, Duray PH, Anderson AE, Mahoney EB. Fatal pancarditis ina patient with coexistent Lyme disease and babesiosis. Demonstration of spirochetes in the myocardium. *Ann. Intern Med.*103(3), 374-376 (1985).

15. Krause PJ, Telford SR 3rd, Speilman A et al. Concurrent Lyme disease and babesiosis. Evidence for increased severity and duration of illness. *J Am. Med Assoc.* 275(21), 1657-1660 (1996).

16. Centers for Disease Control and Prevention (CDC). Recommendations for the use of a Lyme disease vaccine. *Morb. Mortal. Wkly. Rep.* 48(RR-7) (1999).

17. Klempner MS, Hu LT, Evan J, et al. Two controlled trials of antibiotic treatment in patients with persistent symptoms and a history of Lyme disease. *N. Engl. J. Med.* 345(2), 85-92 (2001).

18. Sigler S. Kershaw P, Scheuch R. Sklarek H, Halperin J. Respiratory failure due to Lyme meningoradiculitis. *Am. J. Med.* 103(6), 544-547 (1997).

19. Oski J, Kalimo H, Marttila RJ et al. Inflammatory brain changes in Lyme borreliosis. A report on three patient and review literature. *Brain* (1996) 119(Pt 6), 2143-2154 (2003).

20. Fallon BA, Schwartzberg M, Bransfield R, et al. Late-stage neuropsychiatric-Lyme borreliosis. Differential diagnosis and treatment. *Psychosomatics* 36(3), 295-300 (1995).

21. Food and Drug administration. Lyme disease test kits: potential for misdiagnosis. *FDA Med. Bull.* (1999).

22. Donta ST,. Tetracycline therapy for chronic Lyme disease. *Clin Infect. Dis.* 25(Suppl. 1) S52-S56 (1997).

23. Centers for Disease Control and Prevention (CDC). Case definition for infectious conditions under public health surveillance. (Lyme disease surveillance case definition). *Morb. Mortal. Wkly Rep.* 46(RR10,1-3), 15-16 (1997).

24. Georgilis K, Peacocke M, Klempner MS. Fibroblasts protects the Lyme disease spirochete, B. burgdeoferi, from ceftriaxone in vitro. *J. Infect. Dis.* 166(2), 440-444 (1992).

25. Coyle PK. B. burgdorferi infection: clinical diagnosis techniques. *Immunol. Invest.*26(1-2), 117-128 (1997).

26. Brouqui P, Badiaga S, Raoult D, Eucaryotic cells protect B. burgdorferi from the action of Penicillin and ceftriaxone but not from the action of doxycycline and erythromycin. *Antimicrob. Agents. Chemother.* 40(6) 1552-1554 (1996).

27. Mahmoud AA. The challenge of intracellular pathogens. *N. Engl. J. Med.* 326(11), 761-762 (1992).

28. Brorson O, Brorson SH. A rapid mehod for generating cystic forms of B burgdorferi, and their reversal to mobile spirochetes. *Apmis* 106(12), 1131-1141 (1998).

2

29. Zajkowska JM, Hermanowska-Szpakowicz T, Pancewicx SA, Kondrusil M. Selected aspects of immunopathegenesis in Lyme disease. *Pol. Merkuriucz.* 9(50), 579-583 (2000).

30. Preac Mursic V, Marget W, Busch U, Pleterski Rigler D, Hagl S. Kill kinetics of B. burdorferi and bacterial findings in relation to the treatment of Lyme borreliosis. *Infection* 24(1), 9-16 (1996).

31. Liegner KB, Kochevar J, Guidelines for the clinical diagnosis of Lyme disease. *Ann. Intern. Med.* 129(5) 422 (1998).

32. Straubinger RK, Straubinger AF, Summers BA, Jacobson RH. Status of B. burgdorferi infection after antibiotic treatment and the effects of corticosteroids: an experimental study. *L Infect Dis* 181(3). 1069-1081 (200).

33. Ma B, Christen B, Leung D, Vigo-Pelfry C. Serodiagnosis of Lyme Borreliosis by Western immunoblot: reactivity of various significant antibodies against B. burgdorferi. J Cin Microbiol 1992; **30**: 370-376.

34. Oski J, et al., B. burgdorferi detected by culture and PCR in clinical relapse of disseminated Lyme borreliosis. *Ann. Med.,* 1999. 31(3): 225-32.

35. Fallon, BA, *Testimony at public hearings in re Lyme disease for the State of Connecticut Department of Public Health.* 2004: p. 134-153.

36. Krupp LB., et al., Study and treatment of post Lyme disease (STOP-LD): a randomized double masked clinical trial. *Neurology,* 2003. 60(12): 1923-1930.

37. Fallon BA., Laboratory findings in chronic Lyme disease and results of the controlled treatment study in Columbia University/LDA's Lyme and Other Tick-Borne Diseases: Technology Leading the Way Conference. 2004. Rye Town, NY.

38. Walberg, P. et al., Treatment of Late Lyme Borreliosis. *J. Infect.* 1994. 29(3):p 255-61.

39. Oski, J. J Nikoskelainen, and MK Viljanen, Comparison of oral cefixime and intravenous ceftriaxone followed by oral amoxicillin in disseminated Lyme borreliosis. *Eur J. Clin Microbiol Infec. Dis.* 1998. 17(10): p:715-719.

40. Fallon, BA., Repeated antibiotic treatment in chronic Lyme disease: *J Spirochete Tick Borne Dis,* 1999. 6(Fall/Winter) p: 94-101.

41. Donta, ST. Tetracycline therapy for chronic Lyme disease. *Clin Infect Dis.* 1997. 25 Suppl 1, p:S52-56.

42. Stratmoen, J., Neurologic Complications of Lyme Disease: Dilemmas in Diagnosis and Treatment. *Neurology Today:* Vol. 4(4) April 2004. p 71-72.,75.

43. Wormser et al., IDSA Guidelines for Lyme disease: Critical Infectious Diseases 2000; 31:1-14.

44. Tugwell P, et al., The Lyme Disease Network Medical/Scientific Abstract. *Ann. Intern. Med.* Dec. 15,1997; 127(12):1109-11023.

45. Fearn DW., The Basics, A Plain Language Introduction to Tick-born Diseases. *Lyme Times,* Summer 2004; Vol;37 &38;p10.

3

46. Ziska MH, Donta ST, Demarest FC. Physician Preferences in the Diagnosis and Treatment of Lyme Disease in the USA. *Infection* 24(2), 182-186(1996).

47. Fallon BA. *Testimony at Public hearing in re Lyme Disease, State of Conneticut*. Department of Public Health 29th January 2004.

48. Katzel J. Is there a Concensus in Treatment of Lyme Borreliosis? In: *Lyme Disease 1991 Patient/Physicain Perspectives from the US and Canada*. Mermin L. (Ed.), Madison, WI, USA (1991).

49. Krouse PJ, Speilman A, Telford SR, et al., Persistent Pasasitemia after acute Babesiosis. *N. Eng. J. Med.* 1998; 339:160.

50. Herwaldt BL, McGovern PC, Gerwel MP, Easton RM, MacGregor RR. Endemic babesiosis in another eastern state: New Jersey. *Emerg Infect Dis* 2003;9:184-188.

51. Herwaldt BL, Springs FE, Roberts PP, Eberhard ML, Case K, Persing DH, et al. Babesiosis in Wisconsin: a potentially fatal disease. *Am J Trop Med Hyg* 1995:53:146-151.

52. Hatcher JC, Greenberg PD, Antique J. Jimenez-Lucho VE. Severe babesiosis in Long Island: review of 34 cases and their complications. *Clin Infect Dis* 2001;32:1117-11125.

53. Rosner F. Zarrabi MH, Benach JL, Habicht GS. Babesiosis in splenectomized adults: review of 22 reported cases. *Am J Med* 1984;76:696-701.

54. Mylonakis E. When to Suspect and How to Monitor Babesiosis. *Amer Fam Med* May 15,2001:202.


Websites


55. Herwaldt BL, Guy de Bruyn, Pieniazek NJ, Homer M, Lofty KH, Slemenda SB, Fritsche TR, Persing DH, Limaye AP, *Babesia Divergens*-like Infection, Washington State. *CDC Emerging Infectious Diseases* http://www.cdc.gov/ncidod/EID/vol10no4/03-0377.htm.

56. Babesiosis Facts. Directors of Health Promotion and Education. www.astdhpphe.org/infect/babesioisis.html

57. Rubel J. Lyme disease symptoms and characteristics: a compilation of peer-reviewed literature report (compilation of 19 Lyme related deaths). www.lymeinfo.net/LDSymptoms.pdf (accessed July 2004).

58. Edlow J., Tick borne diseases, Lyme. eMedicine www.emedicine.com/emerg/topic588.htm (accessed July 2004).

59. Liegner KB. *Remarks before the NewYork State assembly Committee on Health, Public Hearing*. Chronic Lyme disease and Long term antibiotic treatment, NY, USA, 27 November 2001. www.canlyme.com/leigner.html (accessed July 2004)

4

60. National Institute of Allergy and Infectious Diseases (National Institute of Health). Diagnosis of Lyme disease.
www.niaid.nih.gov/dmid/lyme/diagnosis.htm

61. Cooper C., Safety of long-term therapy with penicillin and penicillin derivitives. Senter for Drug Evaluation and Research.
www.fda.gov/cder/drugprepare/penlongsafety.htm  (accessed July 2004).

62. Harris N.,An Understanding of Laboratory Testing for Lyme Disease. Journ of Spirichetel  and tick-bor dis. (vol5);Spring Summer 1998
www.igenex.com/labtest.htm

5