SAMUEL K. ANDERSON, Oregon State Bar ID Number 035060
Internet E-mail address: sanderson@davisrothwell.com
**DAVIS ROTHWELL EARLE & XOCHIHUA P.C.**
111 SW Fifth Avenue, Suite 2700
Portland, Oregon 97204-3650
Telephone: (503) 222-4422
Facsimile: (503) 222-4428

**JOSHUA BACHRACH,** *pro hac vice* **application to be submitted**
Internet E-mail address: joshua.bachrach@wilsonelser.com
**WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKLER, LLP**
Independence Square West
The Curtis Center, Suite 1130 East
Philadelphia, PA 19106-3308
Telephone: (215) 627-6900
Facsimile: (215) 627-2665

Attorneys for Defendant John Alden Life Insurance Company dba Assurant Health

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| TALIA HINMAN and MELINDA HINMAN, | No. CV-08-1070 PK |
| Plaintiff, | |
| v. | **DECLARATION UNDER PENALTY OF PERJURY OF SAMUEL K. ANDERSON IN SUPPORT OF DEFENDANT'S REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| JOHN ALDEN LIFE INSURANCE COMPANY d/b/a ASSURANT HEALTH, | |
| Defendant. | |

I, Samuel K. Anderson, declare under penalty of perjury that the foregoing is true and correct:

///

**Page 1 -**  DECLARATION UNDER PENALTY OF PERJURY OF
SAMUEL K. ANDERSON
L:\18\HINMAN\PLD\Dec_SKA_MSJReply.wpd

1. I am co-counsel for Defendant John Alden Life Insurance Company dba Assurant Health in this case.

2. This declaration is submitted in support of Defendant's Reply Brief in Support of Defendant's Motion for Summary Judgment.

3. Attached as Exhibit A are true and accurate copies of documents from the Administrative Record relied upon by Defendant in support of Defendant's Reply Brief in Support of Defendant's Motion for Summary Judgment.

DATED this 3rd day of August, 2009.

**DAVIS ROTHWELL EARLE & XÓCHIHUA P.C.**

By  */s/ Samuel K. Anderson*
    **SAMUEL K. ANDERSON, OSB # 035060**
    (503) 222-4422
    Attorneys for Defendant John Alden Life Insurance Company dba Assurant Health

Page 2 -   DECLARATION UNDER PENALTY OF PERJURY OF
           SAMUEL K. ANDERSON
           L:\18\HINMAN\PLD\Dec_SKA_MSJReply.wpd

DAVIS ROTHWELL
EARLE & XÓCHIHUA P.C.
111 SW Fifth Avenue, Suite 2700
Portland, Oregon 97204-3650
Telephone (503) 222-4422 • Facsimile (503) 222-4428

improvements made to the home or place of business, waterbeds, whirlpool baths, exercise and massage equipment and adjustments made to vehicles. It also does not include equipment which can be used by multiple individuals.

### Emergency

An medical condition that manifests itself by symptoms of sufficient severity that a prudent person possessing an average knowledge of health and medicine would reasonably expect that failure to receive immediate medical attention would place the health of the Insured Person, or a fetus in the case of a pregnant woman, in serious jeopardy.

Some examples of an Emergency are: apparent heart attack including, but not limited to, severe, crushing chest pain radiating to the arms and jaw; cerebral vascular accidents; severe shortness of breath or difficulty in breathing; severe bleeding; sudden loss of consciousness; convulsions; severe or multiple injuries, including obvious fractures; severe allergic reactions; cyanosis; apparent poisoning.

### Emergency Medical Screening Exam

The medical history, examination, ancillary tests and medical determinations required to ascertain the nature and extent of an Emergency medical condition.

### Emergency Services

Those health care items and services furnished in an emergency department and all ancillary services routinely available in an emergency department to the extent they are required for the stabilization of the patient.

### Employer

The employer named on the first page of the Benefit Summary.

### Enrollment Date

The date You or Your Dependent(s) enroll for coverage under this plan or, if earlier, the first day of the Waiting Period for such enrollment. For Late Enrollees, Enrollment Date means the first date of coverage under this plan.

### Exclusion Period

The period of time during which specific treatment or services are excluded from coverage.

### Experimental or Investigational

A service or supply is Experimental or Investigational when We determine that it is:
1. not of proven benefit for the particular diagnosis or treatment of a particular condition, as established by any of the reference compendia cited below; or
2. not generally recognized by the medical community as effective or appropriate for the particular diagnosis or treatment of a particular condition; or
3. provided or performed in special settings for research purposes or under a controlled environment or clinical protocol.

We will apply the following five criteria in determining whether services or supplies are Experimental or Investigational:
1. Any medical device, drug, or biological product must have received final approval to be marketed by the FDA for the particular diagnosis or condition. Any other approval granted as an interim step in the FDA regulatory process, e.g., an Investigational Device Exemption or an Investigational New Drug Exemption, is not sufficient. Once FDA approval has been granted for a particular diagnosis or condition, use of the medical device, drug or biological product for another diagnosis or condition will require that one or more of the following established reference compendia recognize the usage as appropriate medical treatment:

   a. The American Medical Association Drug Evaluations;
   b. The American Hospital Formulary Service Drug Information; or
   c. The United States Pharmacopeia Drug Information.

***** FILE COPY *****

As an alternative to such recognition in one or more of the compendia, the usage of the drug will be recognized as appropriate if it is recommended by a clinical study and recommended by a review article in a major peer-reviewed professional journal. A medical device, drug or biological product that meets the above tests will not be considered Experimental or Investigational.

In any event, any drug which the FDA has determined to be contraindicated for the specific treatment for which the drug has been prescribed will be considered Experimental or Investigational;

2. Conclusive evidence from the published peer-reviewed medical literature must exist that the technology has a definite positive effect on health outcomes; such evidence must include well-designed investigations that have been reproduced by non-affiliated authoritative sources, with measurable results, backed up by the positive endorsements of national medical bodies or panels regarding scientific efficacy and rationale;

3. Demonstrated evidence as reflected in the published peer-reviewed medical literature must exist that, over time, the technology leads to improvement in health outcomes, i.e., the beneficial effects outweigh any harmful effects;

4. Proof as reflected in the published peer-reviewed medical literature must exist that the technology is at least as effective in improving health outcomes as established technology, or is usable in appropriate clinical contexts in which established technology is not employable; and

5. Proof as reflected in the published peer-reviewed medical literature must exist that improvements in health outcomes, as defined in item 3 above, is possible in standard conditions of medical practice, outside clinical investigatory settings.

### Extended Care Facility

An institution that meets all of the following requirements:
1. it must be operated pursuant to law;
2. it must be approved for payment of Medicare benefits or be qualified to receive such approval if requested;
3. it must be primarily engaged in providing, in addition to room and board accommodations, skilled nursing care under a licensed Physician's supervision;
4. Registered or Licensed Practical Nurses must supervise 24 hours a day; and
5. a daily record for each patient must be maintained.

This includes intermediate care facilities, skilled nursing care facilities, nursing homes and convalescent homes.

Extended Care Facility does not include any institution that is primarily a clinic; a rest home; a home for the aged; a place for treatment of alcoholism or drug addiction and chemical dependency; a place for Custodial Care; or a facility for Mental Illness.

### Functional Nervous Disorder

Any mental or nervous disorder (including neuroses, psychoneuroses, psychopathy, psychosis or other emotional disorders); affective disorders (including bipolar disorder and major depression); Tourette's disorder; panic disorder; attention deficit disorder; developmental delay or other learning disorders; conduct disorder; alcoholism; drug addiction and chemical dependency.

### Grievance

A written complaint submitted by or on behalf of an Insured Person regarding the:
1. availability, delivery or quality of health care services, including a complaint regarding an adverse determination made pursuant to Utilization Review;
2. claims payment, handling or reimbursement for health care services; or
3. matters pertaining to the contractual relationship between You and Us.

### Group Health Plan

An employee welfare benefit plan (as defined in section 3(1) of the Employee Retirement Income Security Act (ERISA) to the extent the plan provides medical care to Employees or their Dependents directly through insurance, reimbursement, or otherwise.

AR25

EXHIBIT _A_
PAGE _2_ OF _5_

### Large Employer

An employer who employed at least fifty-one (51) employees on business days during the precedingcalendar year and who employs at least two (2) employees on the first day of the plan year. Indetermining the number of employees, companies which are affiliated companies which are eligible to file a combined taxreturn for purposes of federal taxation will be considered one (1) employer.

### Late Enrollee

An Employee or Dependent who enrolls in this plan subsequent to the initial enrollment period duringwhich the individual was eligible for coverage but declined to enroll. A person will not be considered alate enrollee if the person enrolls during a Special Enrollment Period, or during an open enrollment period.

### Maintenance Care

Care that is provided solely to keep the patient's condition at the level to which it has beenrestored. Even if You or Your insured Dependent is in a Hospital or other recognized facility, We will not pay forcare if it is primarily Maintenance Care.

### Medical Foods

Foods that are formulated to be consumed or administered enterally under the supervision of aPhysician. They are specifically processed or formulated to be deficient in one or more of the nutrients present inthe typical nutritional counterparts. They are for the medical and nutritional management of patients with limitedcapacity to metabolize ordinary foodstuffs or certain nutrients contained in normal foodstuffs, or have otherspecific nutrient requirements as established by medical evaluation. They are essential to optimize growth, health andmetabolic homeostasis.

### Medically Necessary/Medical Necessity

A service or supply that We determine, at Our discretion, to be:
1. necessary for the symptoms and diagnosis or treatment of the Illness or Injury;
2. provided for the diagnosis, or the direct care and treatment, of the Illness or Injury;
3. in accordance with generally accepted medical practice;
4. not in excess of that level of care that is needed to provide safe, adequate and appropriatediagnosis or medical treatment;
5. not for convenience purposes (for example, the use of a brace to enable skiing or playingbasketball);
6. the most appropriate level of medical care the Insured Person needs;
7. furnished within the framework of generally accepted methods of medical management currently used in the United States;
8. not Experimental or Investigational as defined in this Certificate; and
9. not for Maintenance Care as defined in this Certificate.

The fact that a Physician prescribes, orders, recommends or approves the care, the level of care orthe length of time care is to be received, does not make the services Medically Necessary.

### Mental Illness

A condition which manifests symptoms for which the primary treatment is psychotherapy orpsychotherapeutic methods or psychotropic medication, regardless of any underlying physical cause. A Mental Illnessincludes, but is not limited to, psychoses, neurotic and anxiety disorders, schizophrenic disorders, affectivedisorders, personality disorders, attention deficit disorders, and psychological or behavioral abnormalities associatedwith transient or permanent dysfunction of the brain or related neurohormonal systems.

In determining whether or not a particular condition is a Mental Illness, We may refer to theedition of the *Diagnostic and Statistical Manual of Mental Disorders* of the American Psychiatric Association that ismost current at the time the Mental Illness is diagnosed. However, for purposes of this Certificate,alcoholism, drug addiction or chemical dependency is not considered Mental Illness.

Nondesignated Transplant Provider means any Physician, facility or supplier other than one designatedby John Alden Life Insurance Company for an Insured Person to use for transplant services. Anondesignated provider may be a participating provider, as defined in this Certificate, but is not specificallyauthorized by John

| Precert Notes | Precert #: 052563807 |
|---|---|
| 03/14/2006 09:19:41<br>User Id: GUNTA | Level I appeal<br>This is the level I appeal review as documented by Dr. Brumblay on 3/13/06.<br><br>Conclusion: Upheld re: Lyme disease diagnosis and therapy<br>Rationale: At issue is whether services including certain office visits, laboratory tests and medication administration services for presumed Lyme disease are excluded from coverage as Experimental/Investigational services. Review of the medical records does not yield information meeting the accepted definition for Lyme disease. The patient lives in an area where she could be exposed to infection with Lyme disease, but the record includes no documentation of an erythema migrans rash and serologic tests do not meet the recommended criteria for positivity. The documented clinical symptoms might occur with a wide variety of conditions. Treatment with oral antibiotics for presumed Lyme disease is documented, but exceeds duration of administration having started on or about October 12, 2004, and continued at least to January 4, 2005. Intravenous antibiotics were administered in two courses including July 19, 2005 to September 30, 2005, and October 1, 2005 to October 31, 2005 for a total of more than three months of treatment. In the absence of meeting established diagnostic criteria for Lyme disease, treatment for Lyme disease is experimental/investigational. In addition, intravenous antibiotic treatment for Lyme disease beyond 28 days is of unproven efficacy and is experimental/investigational. Services that were for the provision of experimental/investigational therapy including intravenous services, office visits and laboratory monitoring are excluded from coverage. Services required for management of complications of experimental/investigational treatment are excluded from coverage.<br><br>Conclusion: Reversed re: certain diagnostic laboratory tests.<br>Rationale: Review of the claims history shows that the office evaluation for October 12, 2004 was considered and paid. Certain diagnostic laboratory tests associated with this evaluation of the patient were denied. In this setting, such diagnostic tests would be considered medically appropriate. For date of service October 15, 2004, denied codes 86256 three times, 86611, and 87476 appear appropriate for consideration under the contract as medically necessary services.<br><br>Precert numbers for this review:<br>052563800<br>052563807<br>052563810<br>053364110<br>Related precert number not part of this review:<br>052563802<br><br>Documents:<br>Appeal file<br>Appeal binder from Dale and Melinda Hinman<br>HMS notes<br>MP 185A<br>Claims history |
| 03/15/2006 10:54:40<br>User Id: GUNTA | Level I appeal (and IDC)<br><br>Level I appeal completed. This note applies to precert #'s 052563800, 052563802, 052563807, 052563810 and 053364110.<br>Certain lab services on 10/15/04 which had been denied by the Claims Dept. have been approved as medically necessary. These include: 86256 Fluorescent noninfectious agent screen, 86611 antibody Bartonella, and 87476 infectious agent detection, Borrelia burgdorferi.<br>The initial Health Mgmt determinations have been upheld. The services related to treatment of alleged Lyme disease from 3/29/05 - 10/31/05 is experimental.<br>Services required for complications of experimental treatment are not covered.<br>All other denials by the Claims dept. for treatment related to the alleged Lyme disease are upheld as experimental.<br><br>Level I appeal determination letter reviewed by legal and mailed to Melinda Hinman, Providence Hood River Memorial Hospital, Dr. Christine Greene, Dr. Janice Journeau, Immungenex Inc., and Laboratory Corporation of America along with the Oregon group appeal enclosure.<br><br>E-mail to Boise Corr. regarding the above determination. Also, the level I appeal determination under pc # 052563802 had approved certain labwork on 10/13/04. These remained denied according to the claims history. Included the need to correct these in the e-mail to Boise Corr. |

| Precert Notes | Precert #: 052563810 |
|---|---|

| | |
|---|---|
| 09/04/2007 15:07:24<br>User Id: TENNIE | LEVEL II APPEAL (reopened after being on hold)(precerts 052563800, 052563807, 052563810 and 053364110)<br>Letter of appeal from Christopher Lundberg (attorney & authorized representative), dated 7/31/07, was received at Assurant Health on 8/01/07 and additional information received in HM Appeals 8/13/07.<br>Initial determination of experimental/investigational for office or other outpatient visit and IV antibiotics treatment and insertion of tunneled catheter for dos 10/15/04-10/31/05.<br>Will forward to MCMC for medical advisor review.<br>Please see prior review by Dr. Brusch done on 6/28/06 regarding services 10/15/04-10/31/05.<br>New information in the form of copies of articles was submitted with the appeal. Please review the articles with respect to evidence based medical literature for this disease. Does this literature change the outcome of your previous review??<br><br>Online referral done, confirmation #548002<br>Copy of new peer-reviewed articles and case referral form sent to MCMC via Federal Express. |
| 09/06/2007 14:36:06<br>User Id: TENNIE | LEVEL II APPEAL<br>Tcf Beverly, MCMC, stating that Dr. Brusich is unavailable to review until after 9/11/07. They will forward the review as soon after that as possible. This file is already late, and they have right to attend grievance panel. Sent letter to auth rep advising of delay and that we will notify him when date is scheduled for grievance panel. |
| 09/12/2007 13:31:20<br>User Id: TENNIE | Rec'd review from MCMC:<br>RECOMMENDATION:<br>The requested Lyme disease treatment is considered experimental/investigational.<br>RATIONALE:<br>As stated my original review, I do not believe that the claimant has Lyme disease in any stage. Her Western blot test is negative. There is no documentation of tick exposure or history of erythema migrans. Her clinical course is quite atypical for Lyme disease. Essentially she has no significant supportive evidence of having Lyme disease. Therefore intrinsically the treatment of diagnosis-unsupported Lyme disease with this regimen is experimental/investigational. In addition, there is no evidence-based medicine that supports the approach of prolonged treatment of Lyme disease. Even if the patient did have Lyme disease there is no evidence based medicine that treatment for longer than one month has any improvement in outcome. The information submitted in the form of copies of articles with the appeal does not present evidence-based medicine that is contrary to my previously expressed opinion. In general, the articles were based on animal models, very limited series involving patients. Probably the best-conducted study that was submitted, was a randomized double mast clinical trial (Krupp LB, et al. A randomized double masked clinical trial neurology, 2003 60, 1923-1930.) The conclusion of this trial that there was no beneficial treatment effect of prolonged treatment upon cognitive function or the laboratory measurements of persistent infection. The study does not support the use of additional antibiotic therapy with parenteral ceftriaxone and posttreatment, persistently fatigued patients with "Post Lyme Syndrome". My conclusion is that the submitted literature either cited studies that are of limited validity or are indeed as the above-cited one contradict the patient's position or are essentially irrelevant to the question at hand.<br>CLINICAL SUMMARY:<br>Review of a physician's request to treat the patient with prolonged antibiotic therapy for purported Lyme disease<br>REFERENCE:<br>New Guidelines for Lyme Disease Prevention Clinical Infectious Diseases October 2006.<br><br>John L. Brusch, MD<br>Boarded: Internal Medicine/Geriatric Medicine<br>Boarded: Internal Medicine/Infectious Disease<br>Boarded: Internal Medicine<br>State License # Expiration<br>Massachusetts 32675 11/03/2007<br>09/12/2007 |
| 09/13/2007 08:52:17<br>User Id: TENNIE | LEVEL II APPEAL<br>State of Oregon requires final determination be reviewed by physician licensed in Oregon. Refer to CMO.<br>Do you agree with final determination? |
| 09/13/2007 11:06:30<br>User Id: TENNIE | CMO: COncur with determination from independent board certified infectious disease specialist. This applies to all precertifications including 052563800, 052563807, 052563810 and 053364110. |

AR2526

EXHIBIT __A__
PAGE __5__ OF __5__