FILED

NOV 2 4 2009

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TALIA HINMAN and MELINDA
HINMAN,

          Plaintiffs,

                              CV 08-1070-PK

                              FINDINGS AND
v.                              RECOMMENDATION

JOHN ALDEN LIFE INSURANCE
COMPANY,

          Defendant.

_____

PAPAK, Magistrate Judge:

      Plaintiffs Talia Hinman ("Talia") and Melinda Hinman ("Melinda") filed this action

against defendant John Alden Life Insurance Company ("John Alden") on September 15, 2008,

alleging that Alden violated the Employee Retirement Income Security Act of 1974 ("ERISA")

when it denied coverage for medical treatment received by Talia in 2004 and 2005. Now before

Page 1 - FINDINGS AND RECOMMENDATION

the court are the Hinmans' motion (#8) for summary judgment and John Alden's cross-motion (#16) for summary judgment. I have considered the motions, oral argument on behalf of the parties, and all of the pleadings on file. For the following reasons, the Hinmans' motion should be denied, and John Alden's motion should be granted.

## LEGAL STANDARDS

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied,* 116 S.Ct. 1261 (1996). The substantive law governing a claim or defense determines whether a fact is material. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998).

In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). On cross-motions for summary judgment, the court must consider each motion separately to determine whether either party has met its burden with the facts construed in the light most favorable to the other. *See* Fed. R. Civ. P. 56; *see also, e.g., Fair Hous. Council v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). A court may not

Page 2 - FINDINGS AND RECOMMENDATION

grant summary judgment where the court finds unresolved issues of material fact, even where the parties allege the absence of any material disputed facts. *See id.*

## FACTUAL BACKGROUND

At all material times, Melinda was a participant in a group health insurance plan (the "Plan") funded and administered by defendant John Alden. Talia, Melinda's high-school-age daughter, was enrolled in the Plan as Melinda's minor dependent. The Plan was administered by John Alden itself, doing business under the trade name Assurant Health. The terms and conditions of the insurance provided by the Plan were set forth in a Certificate of Group Insurance bearing Group Policy Number G-67 (the "Policy").

## I.    Policy Provisions

Pursuant to the Policy, John Alden agreed to pay a percentage of covered medical expenses incurred by enrollees in the Plan during any calendar year, after enrollees' payment of such expenses up to a specified deductible amount, and to pay all covered medical expenses once enrollees' payments met a specified out-of-pocket limit. Specifically excluded from covered medical expenses were charges for services not deemed "medically necessary" and charges for services deemed "Experimental or Investigational."

The Policy defined medically necessary services as follows:

A service or supply that We determine, at Our discretion, to be:

1.    necessary for the symptoms and diagnosis or treatment of the Illness or Injury;

2.    provided for the diagnosis, or the direct care and treatment, of the Illness or Injury;

3.    in accordance with generally accepted medical practice;

Page 3 - FINDINGS AND RECOMMENDATION

4.      not in excess of that level of care that is needed to provide safe, adequate
        and appropriate diagnosis or medical treatment;

5.      not for convenience purposes (for example, the use of a brace to enable
        skiing or playing basketball);

6.      the most appropriate level of medical care the Insured Person needs;

7.      furnished within the framework of generally accepted methods or medical
        management currently used in the United States;

8.      not Experimental or Investigational as defined in this Certificate; and

9.      not for Maintenance Care as defined in this Certificate.

Policy at 20. The Policy further provided that "[t]he fact that a Physician prescribes, orders,

recommends or approves the care, the level of care, or the length of time care is to be received

does not make the services Medically necessary." *Id.*

The eighth enumerated element of the definition of a medically necessary service requires

that such services be "not Experimental or Investigational . . . ." *Id.* The Policy defined

experimental or investigational services as follows:

A service or supply is Experimental or Investigational when We determine that it
is:

1.      not of proven benefit for the particular diagnosis or treatment of a
        particular condition, as established by any of the reference compendia
        cited below; or

2.      not generally recognized by the medical community as effective or
        appropriate for the particular diagnosis or treatment of a particular
        condition; or

3.      provided or performed in special settings for research purposes or under a
        controlled environment or clinical protocol.

Policy at 16. The Policy further provided that the Plan administrator would apply the five

Page 4 - FINDINGS AND RECOMMENDATION

following criteria in determining whether services or supplies were Experimental or

Investigational:

1.  Any medical device, drug, or biological product must have received final
    approval to be marketed by the FDA for the particular diagnosis or
    condition. Any other approval granted as an interim step in the FDA
    regulatory process, e.g., an Investigational Device Exemption or an
    Investigational New Drug Exemption, is not sufficient. Once FDA
    approval has been granted for a particular diagnosis or condition, use of
    the medical device, drug or biological product for another diagnosis or
    condition will require that one or more of the following established
    reference compendia recognize the usage as appropriate medical treatment:

    a.  The American Medical Association Drug Evaluations;

    b.  The American Hospital Formulary Service Drug Information; or

    c.  The United States Pharmacopeia Drug Information.

    As an alternative to such recognition in one or more of the compendia, the
    usage of the drug will be recognized as appropriate if it is recommended
    by a clinical study and recommended by a review article in a major peer-
    reviewed professional journal. A medical device, drug or biological
    product that meets the above tests will not be considered Experimental or
    Investigational. In any event, any drug which the FDA has determined to
    be contraindicated for the specified treatment for which the drug has been
    prescribed will be considered Experimental or Investigational;

2.  Conclusive evidence from the published peer-reviewed medical literature
    must exist that the technology has a definite positive effect on health
    outcomes; such evidence must include well-designed investigations that
    have been reproduced by nonaffiliated authoritative sources, with
    measurable results, backed up by the positive endorsements of national
    medical bodies or panels regarding scientific efficacy and rationale;

3.  Demonstrated evidence as reflected in the published peer-reviewed
    medical literature must exist that, over time, the technology leads to
    improvement in health outcomes, i.e., the beneficial effects outweigh any
    harmful effects;

4.  Proof as reflected in the published peer-reviewed medical literature must
    exist that the technology is at least as effective in improving health

outcomes as established technology, or is usable in appropriate clinical contexts in which established technology is not employable; and

5.     Proof as reflected in the published peer-reviewed medical literature must exist that improvements in health outcomes, as defined in item 3 above, is possible in standard conditions of medical practice, outside clinical investigatory settings.

Policy at 16-17.

In addition, the Policy expressly provided the Plan administrator with discretion to interpret the terms of the Policy:

We have discretion to construe and interpret the terms and provisions of the Policy and Certificate, to make determinations regarding issues which relate to eligibility or benefits, to decide disputes which may arise relative to an Insured's rights and to decide questions of Plan interpretation and those of fact relating to the policy and Certificate and the payment of claims.

Policy at 56.

## II.     Talia's Illness and Treatment

In winter 2002, Talia began experiencing flu-like symptoms of fatigue.  It appears that certain of her friends and members of her family may have experienced the same or similar symptoms at or around the same time.  Talia's symptoms, unlike those experienced by her friends and family members, apparently persisted without clearing up over time.  Between January and March 2003, she began developing additional symptoms of pain in her hip that interfered with her ability to play high school sports.  Talia's orthopedist, Dr. George M. Stanley, diagnosed the hip condition as bursitis.

By early 2004, the pain in her hip had become "incapacitating," and had spread to her back and neck.  In spring 2004, she began suffering daily migraine headaches, pain and ringing in her ears, bouts of dizziness, and night sweats.  In spring or summer 2004, Talia's set of symptoms

expanded still further, as she began experiencing gastrointestinal and peripheral nervous system problems. She was seen by a pediatric nurse practitioner on April 24, 2004, and apparently informed the nurse that she had been experiencing such symptoms for the past two and a half months.

By summer 2004, Talia began displaying, in addition to the foregoing, cognitive problems. By that time her pain symptoms had increased in intensity to the point that she was sometimes hardly able to walk.

Between January and October 2004, Talia was seen several times by her primary care provider, Dr. Anthony Gay, and by eight specialist physicians, without receiving a definitive diagnosis or effective treatment for her disorder or disorders. In or around October 2004, Talia was examined for the first time by Dr. Christine Green, a physician whose practice emphasized the treatment of Lyme disease. Green administered a number of tests and concluded on the basis of those tests that Talia had late-stage Lyme disease, with various complications. Among the tests Green administered was a so-called "Western Blot" test, which came out negative for Lyme disease.

Green placed Talia on a long-term treatment of oral and intravenous antibiotics, beginning in October 2004 and ending in October 2005. Over the course of Talia's treatment, her most acute symptoms gradually reduced in intensity, until by the end of the treatment her only remaining symptom was, apparently, a slight over-sensitivity to light and sound.

### III.    Coverage Dispute

The Hinmans submitted Talia's medical expenses incurred in the course of the treatment

prescribed by Dr. Green[1] to John Alden. On September 15, 2005, John Alden denied coverage of

the treatment on the grounds that it was experimental and/or investigational, and therefore not

"medically necessary" as that term is used in the Policy, and consequently not within the scope of

the Policy's insurance coverage. In February 2006, the Hinmans filed an administrative appeal of

John Alden's negative coverage decision, and on March 15, 2006, John Alden upheld its previous

decision.

In July 2007, the Hinmans submitted a second administrative appeal. Following the

second appeal, the medical record was reviewed by a new physician, an infectious disease

specialist who had not been involved in the previous decision or previous appeal. The reviewing

physician concluded that Talia had not suffered from Lyme disease, and that the prescribed

courses of antibiotics were not appropriate for Talia's reported symptoms. On the basis of the

reviewing physician's report, John Alden did not disturb its prior negative coverage decision, and

denied the second appeal on September 13, 2007.

## ANALYSIS

### I.   Applicable ERISA Standard of Review

Where, as here, an ERISA plan provides the plan administrator with express authority to

interpret plan terms and to make final benefits determinations, the federal courts review an

ERISA plan's denial of ERISA benefits for abuse of discretion only. *See Firestone Tire &*

---

[1] It appears that the Hinmans paid Dr. Green's fees out-of-pocket, and, because they at all times understood that Dr. Green was an out-of-pocket provider, do not request reimbursement for those fees. The medical expenses at issue here are solely for the long-term antibiotic treatment Talia received through Providence Hood River Memorial Hospital, and are owed solely to that institution. Those unpaid medical expenses are in the approximate amount of $95,000. The Hinman's did not seek pre-authorization for those medical expenses from John Alden before electing to incur them.

*Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). However, where, as here, "a benefit plan gives

discretion to an administrator or fiduciary who is operating under a conflict of interest, that

conflict must be weighed as a factor in determining whether there is an abuse of discretion." *Id.*

That is, *Firestone* requires "abuse of discretion review whenever an ERISA plan grants discretion

to the plan administrator, but a review informed by the nature, extent, and effect on the

decision-making process of any conflict of interest that may appear in the record. This standard

applies to the kind of inherent conflict that exists when a plan administrator both administers the

plan and funds it, as well as to other forms of conflict." *Abatie v. Alta Health & Life Ins. Co.*,

458 F.3d 955, 967 (9th Cir. 2006). Following *Abatie*, the courts of the Ninth Circuit applying the

abuse of discretion standard to denials of ERISA benefits must "temper the abuse of discretion

standard with skepticism 'commensurate' with the conflict." *Nolan v. Heald College*, 551 F.3d

1148, 1153 (9th Cir. 2009), *quoting Abatie*, 458 F.3d at 969. Such a conflict of interest exists

where, as here, an ERISA plan administrator "both funds the plan and evaluates the claims." *See*

*Metro. Life Ins. Co. v. Glenn*, --- U.S. ---, 128 S. Ct. 2343, 2348 (2008).

    The importance that courts attach to the conflict depends on the "conflict's nature, extent,

and effect on the decision-making process." *Id.* A court may weigh a conflict more heavily, for

example, if the administrator "provides inconsistent reasons for denial," "fails adequately to

investigate a claim or ask the plaintiff for necessary evidence," "fails to credit a claimant's

reliable evidence,"or "has repeatedly denied benefits to deserving participants by interpreting

plan terms incorrectly or by making decisions against the weight of evidence in the record."

*Abatie*, 458 F.3d at 968-69 (internal citations omitted). Courts, however, apply a low level of

skepticism if there is no evidence "of malice, of self-dealing, or of a parsimonious claims-

Page 9 - FINDINGS AND RECOMMENDATION

granting history." *Id.* at 968. The district court may consider evidence outside the administrative

record to decide the nature, extent, and effect of any conflict of interest. *Nolan*, 551 F.3d at

1154. Here, there is no evidence of conflict of interest other than the fact that John Alden both

funds and administers the Plan, and so I apply a moderate, albeit significant degree of skepticism

in reviewing John Alden's decision for abuse of discretion.

In addition, procedural violations by a plan administrator can alter the applicable standard

of review:

> **When an administrator engages in wholesale and flagrant violations of the**
> **procedural requirements of ERISA, and thus acts in utter disregard of the**
> **underlying purpose of the plan as well, we review *de novo* the administrator's**
> **decision to deny benefits.** We do so because, under *Firestone*, a plan
> administrator's decision is entitled to deference only when the administrator
> exercises discretion that the plan grants as a matter of contract. 489 U.S. at 111.
> *Firestone* directs, consistent with trust law principles, that "a deferential standard
> of review [is] appropriate when a trustee *exercises* discretionary powers." *Id.*
> (emphasis added). Because an administrator cannot contract around the
> procedural requirements of ERISA, decisions taken in wholesale violation of
> ERISA procedures do not fall within an administrator's discretionary authority.
>
> In general, we review *de novo* a claim for benefits when an administrator fails to
> exercise discretion.

*Abatie*, 458 F.3d at 972 (bolded emphasis supplied).

Moreover, minor procedural violations committed in the course of exercising discretion

should be weighed by the court in much the same manner as an abuse of discretion:

> As noted, a procedural irregularity in processing an ERISA claim does not usually
> justify *de novo* review. That generalization does not mean, however, that
> procedural irregularities are irrelevant to the court's analysis.
>
> A procedural irregularity, like a conflict of interest, is a matter to be weighed in
> deciding whether an administrator's decision was an abuse of discretion. When an
> administrator can show that it has engaged in an ongoing, good faith exchange of
> information between the administrator and the claimant, the court should give the

> administrator's decision broad deference notwithstanding a minor irregularity. A
> more serious procedural irregularity may weigh more heavily.

*Abatie*, 458 F.3d at 972 (citations, internal quotation marks omitted). Here, there is no evidence

of procedural violations by John Alden.

"An ERISA administrator abuses its discretion only if it (1) renders a decision without

explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of

the plan, or (3) relies on clearly erroneous findings of fact." *Boyd v. Bert Bell/Pete Rozelle NFL*

*Players Ret. Plan*, 410 F.3d 1173, 1178 (9th Cir. 2005). The court cannot substitute its judgment

for the administrator's and will set aside the administrator's discretionary determination only

when it is arbitrary and capricious. *Jordan v. Northrop Grumman Corp. Welfare Ben. Plan*,

370 F.3d 869, 875 (9th Cir. 2004). A district court will uphold an ERISA plan administrator's

decision "if it is based upon a reasonable interpretation of the plan's terms and was made in good

faith." *Boyd*, 410 F.3d at 1178 (internal citation omitted).

The Hinmans do not allege that John Alden issued its decision without explanation or that

John Alden construed the provisions of the Policy in a manner that conflicted with the plain

language of the Policy. Rather, the Hinmans argue that John Alden abused its discretion by

applying provisions of the policy that are so vague as to be incapable of objective application, by

misapplying the express terms of the Policy, by applying coverage criteria not provided for in the

Policy, and/or by relying on clearly erroneous findings of fact. Under the abuse of discretion

standard, a factual finding is "clearly erroneous" when "the entire record leads to a definite and

firm conviction" that the plan administrator made a mistake. *Id.* at 1179 (internal citation

omitted). While plan administrators may not arbitrarily refuse to credit a claimant's reliable

evidence, *Black & Decker Disability v. Nord*, 538 U.S. 822, 834 (2003), "[a] mere tally of experts is insufficient to demonstrate that an ERISA fiduciary has abused its discretion." *Boyd*, 410 F.3d at 1179. "[E]ven a single persuasive medical opinion may constitute substantial evidence upon which a plan administrator may rely. . . ." *Id.*

In general, the abuse of discretion standard permits the district court to review only the evidence presented to the plan administrator. *Winters v. Costco Wholesale Corp.*, 49 F.3d 550, 553 (9th Cir. 1995). District courts, however, may review additional evidence when "[procedural] irregularities have prevented full development of the administrative record," or to determine the nature, extent and effect of a conflict of interest on the decision-making process. *Abatie*, 458 F.3d at 970, 973. Courts begin their review of a benefits denial under an ERISA plan by examining the governing plan documents. *See Pannebecker v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1213, 1218 (9th Cir. 2008).

**II.    Review of Administrator's Decision**

The Hinmans argue that John Alden abused its discretion by applying provisions of the policy that are so vague as to be incapable of objective application, by misapplying the express terms of the Policy, by applying coverage criteria not provided for in the Policy, and/or by relying on clearly erroneous findings of fact. First, the Hinmans argue that John Alden's reliance on the Policy definition of experimental or investigational services was necessarily an abuse of discretion because the Policy definition is insufficiently concrete to permit objective application. In support, the Hinmans rely on a 1991 case from the District of Connecticut that found an insurer's denial of coverage as experimental or investigational to be arbitrary and capricious, namely *Bucci v. Blue Cross-Blue Shield, Inc.*, 764 F. Supp. 728 (D. Conn. 1991).

Analysis of the *Bucci* decision establishes that the Hinmans' reliance is misplaced. In the *Bucci* insurance policy, "experimental or investigational" was defined simply as "any treatment . . . not recognized as accepted medical practice." *Bucci*, 764 F. Supp. at 729. The *Bucci* court noted that significant numbers of physicians did, in fact, "accept" the treatment at issue, and determined that the policy definition constituted a "floating standard" that did not permit insureds to ascertain the minimum number of physicians accepting the practice that would pass the threshold of general acceptance, and instead permitted the defendant insurer to simply raise that minimum number in an arbitrary manner in order to avoid covering claims. *See id.* at 732-733. For those reasons, the *Bucci* court found that the defendant insurer's denial of coverage was arbitrary and capricious.

The Hinmans argue that the definition of experimental/investigational at issue here likewise contains no meaningful limits on John Alden's discretion. However, the Policy definition of experimental/investigational is significantly more concrete than the definition at issue in *Bucci*, and contains sufficient objective criteria not to constitute any kind of "floating" standard. Under the Policy, a procedure is experimental or investigational if it is "not of *proven* benefit for the particular diagnosis or treatment of a particular condition, *as established by any of* [The American Medical Association Drug Evaluations, The American Hospital Formulary Service Drug Information, or The United States Pharmacopeia Drug Information]," or "not *generally* recognized by the medical community *as effective or appropriate for the particular diagnosis or treatment of a particular condition*," or "provided or performed in *special settings for research purposes* or under a controlled environment or clinical protocol." Policy at 16 (emphasis supplied). Of these three disjunctive tests, the first and third provide clear, objective,

Page 13 - FINDINGS AND RECOMMENDATION

standards that very nearly eliminate any discretion in their application. Even the second of the three disjunctive tests, requiring general acceptance within the medical community of a treatment's effectiveness for a given purpose, does not create a floating standard comparable to that found objectionable in *Bucci*. General acceptance, at a minimum, means acceptance by more than half of the relevant medical community, a significant restraint on John Alden's discretion to shift the meaning of the criterion. Moreover, the application of the test is further constrained by the five detailed criteria enumerated at Policy pages 16-17, including the absolute constraint that a "medical device, drug or biological product that [is both recommended by a clinical study and recommended by a review article in a major peer-reviewed professional journal] will not be considered Experimental or Investigational." Policy at 16.

Because the definition of experimental/investigational is sufficiently concrete both to be applied according to objective standards and to permit insureds to predict with reasonable confidence whether a given procedure will fall within the scope of the definition, John Alden did not abuse its discretion by applying the Policy definition to Talia's treatment.

Second, the Hinmans argue that John Alden's decision was arbitrary and capricious because it violated the express terms of the Policy. Specifically, the Hinmans assert that Talia's treatment regimen was recommended by at least one clinical study and by at least one review article in a major peer-reviewed professional journal, and argue on that basis that the regimen cannot have been experimental or investigational under the Policy's express terms. In support of their assertion, the Hinmans point to several review articles, one authored by Deborah A. Metzger, M.D., *see* Malmsheimer Decl., Exh. 12, one by Lorraine Johnson and Raphael B. Stricker, *see* Malmsheimer Decl., Exh. 13, and one by Raphael B. Stricker, *see* Malmsheimer

Page 14 - FINDINGS AND RECOMMENDATION

Decl., Exh. 17. The Metzger article recommends intravenous antibiotic treatment for late-stage Lyme disease for "extended" periods of time, possibly three months or more. *See* Malmsheimer Decl., Exh. 12. However, the Metzger article falls short of recommending the extreme long-term (approximately twelve months) antibiotic treatment received by Talia. Moreover, nothing in the record suggests that the Metzger article was prepared or accepted for publication in a peer-reviewed journal of any stature. The Johnson and Stricker article, by contrast, appeared in the peer-reviewed journal Expert Review of Anti-infective Therapy, and reviewed clinical studies of different approaches to the treatment of Lyme disease. Without addressing whether the Expert Review of Anti-infective Therapy constitutes a "major" peer-reviewed journal, the Johnson and Stricker article does not support the Hinmans' argument because it did not ultimately recommend long-term antibiotic treatment, but rather concluded that more research was necessary. *See* Malmsheimer Decl., Exh. 13.

The Stricker article appeared in Clinical Infectious Diseases, a peer-reviewed journal published under the auspices of the Infectious Diseases Society of America, and reviewed a number of uncontrolled trials of "prolonged" antibiotic treatment for late-stage Lyme disease, and two published and two unpublished controlled studies. The article concluded that the risks of three to four months' antibiotic treatment were "justifiable" in some instances, but fell short of recommending the extreme long-term antibiotic treatment Talia received, *see* Malmsheimer Decl., Exh. 17, and therefore does not support the Hinmans' argument. In addition, the Hinmans submit an article authored by J. Oski *et al.* that appeared in the European Journal of Clinical Microbiology & Infectious Diseases, *see* Malmsheimer Decl., Exh. 18, but as the Oski paper is not a review article it is not sufficient to support the Hinmans' argument. Moreover, the Oski

Page 15 - FINDINGS AND RECOMMENDATION

article reported clinical studies of 3-4 months' antibiotic treatment, and not treatment on the order
of twelve months.

Because the evidentiary record does not support the finding that the treatment Talia
received has been recommended by a review article in a major peer-reviewed professional
journal, the Hinmans' argument that John Alden's decision was arbitrary and capricious
necessarily fails. In addition, the record contains substantial evidence, upon which John Alden
was entitled to rely in making its coverage decision, that intravenous antibiotic treatment over
periods greater than one month is not generally accepted for the treatment of Lyme disease or of
post-Lyme disease syndrome. *See* Anderson Decl., Exh. A at 92 and authority cited therein.
Because John Alden based its decision on substantial evidence in the record, and because the
record contains no evidence that John Alden rendered its decision without explanation, construed
Policy provisions in a manner that conflicted with the Policy's plain language, or relied on clearly
erroneous findings of fact in determining that Talia's treatment was not medically necessary, John
Alden did not abuse its discretion in denying coverage for Talia's treatment.

The Hinmans' third set of arguments is that John Alden abused its discretion when it
refused to accept Dr. Green's diagnosis of Lyme disease. They argue that John Alden's rejection
of Dr. Green's diagnosis was arbitrary and capricious in that it necessarily relied on the
importation of criteria regarding the diagnosis of Lyme disease into the Policy that are contrary to
the Policy's express terms, specifically the importation of criteria not designed for diagnostic
purposes, but rather developed for the purpose of uniform disease reporting by the Centers for
Disease Control. The Hinmans further argue that John Alden arbitrarily and capriciously ignored
the medical evidence relied upon by Dr. Green in reaching her diagnosis, and that John Alden

was arbitrary and capricious in relying on the Level II reviewer's finding that studies recommending Talia's treatment were of "limited validity" because they were based on animal rather than human trials.

Assuming *arguendo* that the Hinmans are correct that John Alden abused its discretion in rejecting Dr. Green's Lyme disease diagnosis, their claim nevertheless fails because, for the reasons discussed above, John Alden did not abuse its discretion in determining that Talia's treatment regimen was not medically necessary, and therefore outside of the scope of the Policy's coverage. Moreover, the record does not support the Hinmans' arguments. John Alden's finding that Talia was misdiagnosed with Lyme disease, while contradicted by one medical opinion in the record (Dr. Green's), is consistent with numerous other medical opinions in the record, including those of both John Alden's consulting physicians and all of Talia's own examining physicians other than Dr. Green, and is supported by objective medical evidence, including the Western Blot test of October 2004. While the interpretation of the medical evidence may be subject to more than one interpretation, and while it is possible that Dr. Green's interpretation was ultimately the correct one, John Alden's finding was reasonable and supported by evidence in the record, and therefore not arbitrary or capricious.

## CONCLUSION

For the reasons set forth above, the Hinmans' motion (#8) for summary judgment should be denied and John Alden's cross-motion (#16) for summary judgment should be granted. A final judgment should be prepared.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any,

Page 17 - FINDINGS AND RECOMMENDATION

are due December 9, 2009. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 24th day of November, 2009.

Honorable Paul Papak
United States Magistrate Judge